# Staunton

## FARMERS AND MECHANICS BENEVOLENT FIRE INSURANCE ASSOCIATION OF ROANOKE AND BOTETOURT COUNTIES, VIRGINIA v. W. H. HORTON, WHO SUES FOR THE BENEFIT OF SUSIE G. HORTON.

September 17, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Leonard G. Muse* and *Woods, Chitwood, Coxe & Rogers,* for the plaintiff in error.

*Horace M. Fox,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Designating the parties as they were designated in the trial court, plaintiff is seeking to recover on a fire insurance policy issued by the defendant company to Susie G. Horton on November 4, 1927.

Susie G. Horton is the wife of W. H. Horton who has acted for her throughout this entire transaction. He applied for the policy, it was delivered to him, and it is he who is actively prosecuting the demand for recovery.

The defendant corporation was chartered in 1873 by a special act of legislation. It is a strictly mutual company, and its policies, charter, constitution and by-laws passed in pursuance thereof, make up the contract between it and its members, who are conclusively presumed to have knowledge of them all. *Bixler* v. *Modern Woodmen,* 112 Va. 678, 681, 72 S. E. 704, 38 L. R. A. (N. S.) 571.

Among the by-laws printed on this policy itself is one numbered 18, which reads as follows: "Any member of the association who fails to pay any legal assessment within sixty days from the date of the making or levying of the same shall thereby forfeit his membership and all rights pertaining thereto and his policy shall be canceled, but he shall not be released from his obligation to pay his assessment;

and the secretary and treasurer shall at once take steps to collect the same, provided that the secretary or the agent has given him at least thirty days' notice before the expiration of the sixty day limit."

On February 9, 1929, an assessment for losses theretofore sustained was levied. Notice of this assessment, properly addressed, was mailed to the plaintiff. He testifies that he never saw it. Probably it was lost through negligence at his home. On the same day a notice to the same effect, together with a number of tickets covering the property afterwards burned and other properties owned by the plaintiff and insured by him in this company, were sent to J. P. Saul, the agent through whom the insurance was written. Shortly thereafter, and within ten days, Saul wrote to Mr. Horton, saying:

"DEAR SIR:

"Statements for the annual assessment of the Farmers and Mechanics Benevolent Insurance Company are in my hands for payment. 20 Tickets.

"Please forward me check for $157.75 upon receipt of which I will send you your ticket marked 'paid.'

"If you cannot send check at present time, please let me know what date I may call on you for same.

"Very truly yours,

"J. P. SAUL.

"P. S. The board of directors has ordered that section 18 of the by-laws be strictly adhered to and agents are instructed to have all policies cancelled on which this assessment has not been paid within sixty days after the date of levy.

"R. M. HOWELL, *Secretary*."

Attached to this letter was a slip of paper on which appeared the items that went to make up the $157.75—that is to say, the figures that went to make up this sum appeared and nothing more. Mr. Horton says that he did not under-

stand them, but there is nothing uncertain about the letter itself, and if any doubt in fact existed it was cleared up by Mr. Saul, who talked the matter over several times with him. Indeed, Horton's evidence is that Saul told him that he might pay them at his convenience—a statement flatly in conflict with his instructions.

It was Saul's duty, as it was the duty of all agents, to make settlement with his company at the end of sixty days for assessment tickets sent him for collection. In the instant case he failed to do this, and at a board meeting held on April 24th, he was questioned as to why it had not been done. He replied that he was ready to make settlement and had collected all tickets sent him except the Horton tickets which would be paid within a few days. Thereupon, on that day, the policy in litigation was canceled.

On May 3, 1929, Saul sent to Horton this letter:

"Mr. W. H. Horton,

"Route No. 7,

"Roanoke, Virginia.

"My Dear Friend Horton:

"Now listen to me: On the 18th day of May, we have our annual Fire Company at Lakeside, and before that time our secretary has to have his books audited and all agents are supposed to have their accounts all settled up before that time and audited. We are supposed to have all our accounts in by the 10th or 12th of May. I am enclosing a self-addressed, stamped envelope, and please tell me tomorrow what day I can look for remittance from you. Please do this tomorrow, Will, and oblige.

"I am at home, sick in bed, or I would come to see you.

"With kindest regards,

"Sincerely yours,

"J. P. Saul,

"(Per S.)."

In answer to this letter Horton sent on May 4th, check

for amount due. The property insured was burned on May 7th. On the face of this record, plainly, the plaintiff was too late unless he can show some adequate reason, or excuse, for delay.

For him it is said that a habit, custom, or usage, had grown up between this company and its agents, under which they were permitted to extend credit to policyholders.

■ If it be true that through such a course of dealing this company had induced them to believe that the clause of forfeiture would not be insisted upon, it would afterwards be estopped to take advantage of delays for which it was responsible. *Helme* v. *Philadelphia Life Insurance Co.*, 61 Penn. 107, 100 Am. Dec. 621.

To this contention there are two answers. If any. such custom existed, Mr. Horton did not know of it, and so could not have been misled. The other answer, still more conclusive, is that during the lifetime of his policy there was no such custom.

The secretary-treasurer is the executive officer of this corporation. Mr. E. W. Bowie had for many years filled these positions. Under his administration it was undoubtedly lax in making collections. He was succeeded by Mr. Howell, who went into office in May, 1927, and before plaintiff's policy was written. For the express purpose of putting an end to this careless method of doing business he was ordered by the board of directors to see that by-law number 18 was observed, and he promptly notified his agents of this new policy. Since that time it has been observed. It is perfectly true that agents do not always make settlement at the end of a sixty-day period for tickets placed with them for collection. Should an agent delay, say for two weeks, and then report all tickets collected, the company would not know the date of their payment, and so it is possible that some policy which would have been forfeited had the facts been known may be continued in force. This

is a possibility, but there is nothing to show that these agents were in the habit of violating their instructions, and certainly the company knew of no such habit.

Of course, it is possible that some policy may have slipped by—there were 2,800 of them; but one swallow does not make a summer, nor one mistake a habit. As a matter of fact, Mr. Horton relied entirely upon his friend, Mr. Saul, who had undertaken to extend to him an unwarranted indulgence.

It is next said that where credit is extended to an agent, who in turn extends it to the insured, no forfeiture can be enforced for nonpayment of premiums, and we are cited, as sustaining that proposition, to 32 Corpus Juris 1312; *Perea* v. *State Life Insurance Company*, 15 N. M. 399, 110 Pac. 559; Cooley's Briefs on Insurance, volume 1, page 484; and *Wytheville Insurance Co.* v. *Teiger*, 90 Va. 277, 18 S. E. 195.

With it we have no quarrel. In such cases the company looks to its agent for payment, and he extends credit to the insured at his peril. Here there was no such course of dealing. No agent was ever asked to pay, or expected to pay, a dollar which he did not collect. When tickets are turned over for collection, a memorandum of them and of their amount is made, and so, loosely speaking, it might be said that an agent is charged with them, but such a statement would be misleading. A man cannot possibly be charged with something which he is never expected to pay, and which he will never be asked to pay. Upon the facts, the rule invoked has no application.

Reliance is next placed upon Code, section 4335, which declares that five days' notice of purpose to forfeit must be mailed to the insured. This was not done.

That section is a part of chapter 173 of the Code (sections 4327, *et seq.*), as is section 4340, which declares that none of the provisions of this chapter shall apply to mutual

fire insurance companies theretofore chartered. This chapter, in the main, is a reproduction of a comprehensive codification of insurance laws, of date March 9, 1906, which appears in the Acts of Assembly of that year, pages 122-172, chapter 112.

It is said that the exemption last noted is unconstitutional in that—

1. It violates the fourteenth amendment of the Federal Constitution, and denies to all corporations of this character equal protection of law;

2. It violates section 63, clause 18, of the Constitution of Virginia which prohibit the granting of special privileges and immunities to any private corporation;

3. It violates section 64 of the Constitution of Virginia which prohibits class legislation.

Of course, these things cannot be done, and we shall not undertake to discuss authorities which support a proposition not in dispute. Certainly a classification truly arbitrary cannot be sustained. The legislature could not tax red-haired men and relieve brunettes. It could not assess against men thirty years old a $1.00 poll tax, and charge those thirty-two years old with $2.00. But it is equally well established that those classifications which are reasonable and not arbitrary are lawful. It is likewise true that all acts of the legislature are presumed to be constitutional, and that every reasonable doubt on this subject must be solved in favor of their validity. For example, in the trial of violators of our prohibition laws, certain established rules of evidence as to reputation have been changed by statute—that is to say, the legislature was of opinion that these malefactors should be dealt with specially and so classified them. That classification was held not to be arbitrary. In such matters, legislative judgment must be sustained unless it is wholly unreasonable.

"The necessity for and the reasonableness of classification are primarily questions for the legislature. If any

state of facts can reasonably be conceived that would sustain it, that state of facts at the time the law was enacted must be assumed." *Anthony* v. *Commonwealth*, 142 Va. 577, 128 S. E. 633, 634. And again, "constitutional prohibitions against special legislation do not prohibit classification." *Martin's Executors* v. *Commonwealth*, 126 Va. 612, 102 S. E. 77, 80, 724. It must be appropriate to the occasion. *Polglaise* v. *Commonwealth*, 114 Va. 850, 865, 76 S. E. 897; *Commonwealth* v. *United Cigarette Machine Co.*, 120 Va. 835, 92 S. E. 901.

■ Before 1906, when the statute in judgment was enacted, unnumbered mutual fire insurance companies had been chartered. Some of them, like the Mutual Assurance Society of Virginia, were almost as old as the Commonwealth itself. That charters are contracts has long been recognized, and as such are to be respected. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 4 L. Ed. 629; Constitution of Virginia, section 158. The legislature was, of course, anxious to avoid anything which appeared to impair their rights. On the other hand, it was desirable that special privileges should no longer be given to these companies at random, and that those thereafter chartered should all be governed by certain general statutory regulations.

It was to correct this evil and to carry out this purpose that the statute of 1906 was enacted. In it, these provisions, among others, appear: Companies there dealt with must have a membership of not less than twenty-five persons, who should own collectively not less than $50,000.00 worth of property. They are required to pay for all damages suffered up to the face of their policies. In certain contingencies officers are made personally liable. Nonresidents cannot hold office. The mailing of notice of assessment properly addressed is sufficient. None of them are charter limitations on the defendant here. Should an attempt have been made to impose them, litigation would unquestionably have followed. The legislature had no desire to

provoke controversies of this nature, and so the distinction between companies to be chartered after that legislative enactment and those chartered before it went into effect is readily apparent, and gives ample support to legislative classification.

Moreover, when we come to examine the act of 1906 (chapter 112) and particularly sub-chapter 7, which deals with these mutual assessment companies, we find that in terms it applies only to companies thereafter chartered, and, therefore, of necessity, the five days' notice prescribed as a prerequisite to forfeiture applies to them only. It further follows that there was no occasion to except from the operation of this statute companies theretofore chartered, for the body of the act itself shows that they were not affected. This exception was merely inserted out of an abundance of caution.

The chapter cited has been since amended, but we find nothing in these amendments which affects the principles stated.

In this case there were two trials. At the first there was a verdict for the defendant, which was set aside by the trial court. At the second there was a verdict for the plaintiff. Ordinarily, if the first verdict should have been confirmed, the court will so order, and not undertake to examine the proceedings at the second trial at all. *C. & O. Ry. Co.* v. *Palmer,* 149 Va. 560, 140 S. E. 831. Here there is some controversy as to the sufficiency of the assignments of error which deal with the actions of the court in the first instance. In the main, the same questions were presented at each trial. The defendant, so far as the verdict is concerned, prevailed at the first, and since it should have prevailed on the merits of its case at the second trial, we have dealt with it alone.

For reasons stated, final judgment should be entered for the defendant.

*Reversed.*